IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) Chapter 11 |
| Richard J. Munson and Lida Downey | ) |
| a/k/a Lida Downey Munson, | ) |
| | ) Case No. 10 B 01559 |
| Debtors. | ) |
| | ) |
| Consumers Cooperative Credit Union, | ) |
| | ) Hon. Susan Pierson Sonderby |
| | ) |
| Plaintiff, | ) Adv. No. 10 A 00218 |
| v. | ) |
| | ) |
| Richard J. Munson and Lida Downey | ) |
| a/k/a Lida Downey Munson, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION**

This matter comes before the court on Debtors/Defendants' motion to dismiss the adversary complaint (the "Complaint") filed by Plaintiff, Consumers Cooperative Credit Union (the "Credit Union"). For the reasons set forth below, the motion will be granted.

In its Complaint, the Credit Union alleges that on or about August 1, 2005, the Debtors and defendants herein, Richard J. Munson and Lida Downey ("Debtors"), purchased a 2005 Land Rover. The purchase was financed through a loan from the Credit Union in the principal amount of $58,274.54. The Credit Union further alleges that pursuant to the express terms of the loan and security agreement (a copy of which, entitled "Open-End Voucher and Security Agreement" (the

-1-

"Security Agreement"), is attached to the Complaint as Exhibit A) and the terms of the restrictive endorsement on the loan proceeds check (a copy of which is attached to the Complaint as Exhibit B), the $58,274.54 loan was to be secured by a lien on the title to the Land Rover. The Security Agreement states, *inter alia*, that the "advance is secured by your shares, all property securing other plan advances and loans received in the past or in the future, and the following property/model," to-wit: "Land Rover LR3 HSE 2005 ... " The Security Agreement further states that "[b]y signing below, by endorsing the proceeds check or by using the amount advanced and deposited into your share/share draft account you agree: 1. To make and be bound by the terms of this Security Agreement including the cross collateral clause ..." Finally, paragraph 4 of the Security Agreement provides in pertinent part as follows:

> 4.  **PROTECTING THE SECURITY INTEREST** – If your state issues a title for the property, you promise to have our security interest shown on the title. We may have to file what is called a financing statement to protect our security interest from the claims of others. If asked to do so, you promise to sign a financing statement. You also promise to do whatever else we think is necessary to protect our security interest in the property. ...

In the Security Agreement, "[a]ll references to 'you,' 'your,' and 'borrower' mean each person who signs" the agreement. Debtor Richard Munson signed the Security Agreement as "BORROWER;" Debtor Lida Downey signed as "OWNER OF COLLATERAL (Other than a Borrower)."

The loan proceeds check, which was made payable to both the car dealership and Debtor Richard Munson, contained the following restrictive endorsement:

> Payees warrant this draft constitutes full payment for property described on face of draft. Payees agree to title said property only in the name of the non-seller payees and agree to register (perfect) a first lien in favor of Consumers Cooperative Credit Union.

Debtor Richard Munson endorsed the proceeds check.

The Credit Union further alleges that upon making the loan to Debtors, it tendered the funds to the dealer and requested that the dealer perfect the Credit Union's lien upon the title to the vehicle. For reasons not known to the Credit Union, the dealer did not perfect the lien; instead, the dealer delivered to Debtors the certificate of title issued by the Illinois Secretary of State without the Credit Union's lien noted thereon.

The Credit Union, upon learning that such a certificate had been delivered to Debtors, made numerous demands, both written and oral, upon Debtors to tender the certificate to the Credit Union, along with a properly executed title application, so that the Credit Union might take the necessary steps to perfect its lien. According to the Credit Union, Debtors failed and refused, despite these demands, to tender the title certificate.

On September 17, 2009, the Credit Union filed suit against Debtors in the Circuit Court of Cook County, "seeking relief in detinue, specific performance and contract damages." Complaint, at ¶ 9. The action "sought recovery of the Land Rover and an order directing the Defendants to execute the appropriate application with the Illinois Secretary of State to have the Credit Union's lien perfected." *Id*. On December 7, 2009, the state court entered a "Judgment in Detinue" (a copy of which is attached to the Complaint), stating, *inter alia*, that the Credit Union had established a right to possession of the Land Rover and ordering Debtors to return it to the Credit Union within fourteen days. The order further provided that the case was continued to January 11, 2010 "for status on the return of the collateral." According to the Credit Union, Debtors failed to comply with this order.

On January 16, 2010, Debtors filed the instant Chapter 11 case and scheduled the Credit Union as an unsecured creditor. The Credit Union alleges that the balance remaining due to it from Debtors is $10,373.34 plus attorney's fees.

In its Complaint, the Credit Union alleges that Debtors "represented and pledged that they would grant the Credit Union a lien" upon the Land Rover and that "in obtaining the unperfected title from the dealer and not tendering the certificate to the Credit Union, [Debtors] did knowingly and purposefully harm the credit union by allowing its loan to remain unperfected and now classified as 'unsecured'." Complaint, at ¶ 14. According to the Credit Union, this "conduct ... constitute[s] an exception to discharge under ... §523(a)(2)(A)" of the Bankruptcy Code. *Id.* at ¶ 15.

The Credit Union further alleges that "[i]n so retaining the title to the Land Rover and ignoring the Circuit Court's order ... to surrender the vehicle ... the Debtors willfully, maliciously and intentionally harmed the Credit Union by depriving it [of] its rights of recourse to the collateral. *Id.* at ¶ 16. According to the Credit Union, such "conduct constitutes an exception to discharge under ... §523(a)(6)." *Id.*

In its prayer for relief, the Credit Union requests an order determining that the debt owed to it by Debtors is nondischargeable under § 523(a)(2)(A) and (a)(6). The Credit Union does not mention § 523(a)(2)(B) in its prayer for relief or anywhere else in the Complaint, except in the introductory paragraph (where it states that the Complaint is brought "pursuant to ... §523(a)(2)(A), §523(a)(2)(B) and §523(a)(6)"). As discussed further below, however, the Credit Union contends in its response to Debtors' motion to dismiss that the complaint also states a claim under §523(a)(2)(B).

**Discussion.**

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a), 28 U.S.C. § 1334, and Internal Operating Procedure 15 of the United States District Court for the Northern District of

Illinois. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). Venue lies in this court pursuant to 28 U.S.C. § 1409.

Again, Debtors have moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), applicable herein by virtue of Bankruptcy Rule 7012. Accordingly, all of the well-pleaded facts alleged in the Complaint will be accepted as true for purposes of the motion to dismiss, all possible inferences being drawn in the Credit Union's favor. *See Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). As noted by the Seventh Circuit in *E.E.O.C. v. Concentra Health Services, Inc.*, 496 F.3d 773 (7th Cir. 2007), the Supreme Court "has interpreted that language to impose two easy-to-clear hurdles. First, the complaint must describe the claim in sufficient detail to give the defendant 'fair notice of what the ... claim is and the grounds upon which it rests.' ... Second, its allegations must plausibly suggest that the plaintiff has a right to relief, raising that possibility above a 'speculative level'; if they do not, the plaintiff pleads itself out of court." *Id.* at 776 (citing *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1964 (2007)). While the complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic*, 127 S.Ct. at 1964-65. The plaintiff must plead "enough facts to state a claim for relief that is plausible on its face." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (citing *Bell Atlantic*).

Where fraud is alleged, a more rigorous pleading standard comes into play. Rule 9(b) provides, *inter alia*, that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Under this standard, a plaintiff must state the "who, what, when, and where of the alleged fraud." *Uni Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir. 1992). The particularity requirement of Rule 9(b) applies equally to all claims which are based upon an underlying fraud, including fraud claims under § 523(a)(2)(A). *See In re Lane*, 937 F.2d 694, 698 (1st Cir. 1991).

### Nondischargeability claim under § 523(a)(2)(A):

Section 523(a)(2)(A) renders nondischargeable any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition ..." The Credit Union contends that Debtors made a false representation when they signed the Security Agreement (and when Debtor Richard Munson signed the proceeds check) promising to have the Credit Union's lien noted on the vehicle title. The Credit Union states:

> When the [Debtors] signed the security agreement and endorsed the check with the restrictive endorsement, they represented that they would follow through with obtaining the lien on the Land Rover's title ... The ... complaint alleges that the [Debtors] did not follow through with obtaining the ... lien ... and *thus* expressly made a false representation.

Response, at 6 (emphasis added). However, Debtors' mere *subsequent* failure to "follow through with obtaining the ... lien" does not by itself suggest that the representation was false when made. For purposes of § 523(a)(2)(A), the misrepresentation must generally relate to a present or past

fact; if the promise relates to an act to be performed in the future, it is only actionable if made with a present intention not to perform. *See, e.g., In re Brzakala*, 305 B.R. 705, 711 (Bkrtcy. N.D.Ill. 2004); *see also In re Alicea*, 230 B.R. 492, 501 (Bankr. S.D.N.Y. 1999); *In re Pawlinski*, 170 B.R. 380, 393 (Bankr. N.D.Ill. 1994).

While the Credit Union refers in its response brief to such a present intention not to perform (*see* Response, at 5-6) and invites the court to infer the requisite fraudulent intent from the surrounding circumstances (*see* Response, at 7), there is no allegation of a present intention not to perform contained in the Complaint. Moreover, in support of its invitation to infer fraudulent intent from the surrounding circumstances, the Credit Union cites in its response brief merely to Debtors' "refus[al] to re-title the Land Rover" in spite of "their earlier representation ...." *See* Response, at 7. Again, however, Debtors' subsequent failure or refusal to perform their promise to perfect the Credit Union's lien does not plausibly suggest that at the time they made the promise, they had no intention of performing it. Indeed, with respect to intent, the Credit Union has gone a long way toward pleading itself out of court. According to the Complaint, by the time the instant adversary proceeding was filed, Debtors had reduced the principal balance owed to the Credit Union to $10,373.34. Accordingly, Debtors paid - - subsequent to their August 2005 promise to perfect the Credit Union's lien - - over $47,900 (i.e., over 82%) of the $58,274.54 loaned by the Credit Union for the purchase of the Land Rover. Such significant subsequent performance seems inconsistent with an intention, at the time the Security Agreement was entered into, not to perform the promise to perfect the lien. *See, e.g., In re Brzakala*, 305 B.R. 705, 712 n. 3 (Bkrtcy. N.D.Ill. 2004) (court noted that debtor's partial payment of moneys owed under contract tended to dispel inference that debtor never intended to comply with

agreement).

The court notes, finally, that while "actual fraud" was not specifically argued by the Credit Union, it could constitute a third possible basis for a finding of nondischargeability under §523(a)(2)(A). That provision refers to three separate grounds for relief, i.e., "false pretenses," "a false representation," or "actual fraud," and while it was often held that a single test applies to all three, the Seventh Circuit made it clear in *McClellan v. Cantrell*, 217 F.3d 890 (7th Cir. 2000), that misrepresentation and reliance thereon are not always required to establish "actual fraud." *In re Jairath*, 259 B.R. 308, 314 (Bankr. N.D.Ill. 2001) (citing *McClellan*, 217 F.3d at 894). In *McClellan*, the Seventh Circuit stated:

> No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions. "Fraud is a generic term, which embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth. No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated."

*McClellan*, 217 F.3d at 893 (quoting from *Stapleton v. Holt*, 207 Okla. 443, 250 P.2d 451, 453-54 (1952)).

Courts have noted that where non-representational fraud is alleged, a different analysis must be employed to assess the sufficiency of the complaint. *See, e.g., In re Demopoulos*, 2008 WL 4489153, at *8 (Bankr. N.D.Ill. Sept. 23, 2008); *see also In re Burke*, 398 B.R. 608, 624 (Bankr. N.D.Ill. 2008); *In re Howard*, 339 B.R. 913, 918 (Bankr. N.D.Ill. 2006); *In re Jairath*, 259 B.R. 308, 314 (Bankr. N.D.Ill. 2001). The plaintiff's allegations must plausibly suggest that the debtor perpetrated a fraud against the plaintiff, acting with intent to defraud, and that the

plaintiff sustained loss as a result. *See In re Demopoulos*, 2008 WL 4489153, at *8; *see also Howard*, 339 B.R. at 918; *Jairath*, 259 B.R. at 314. As noted in *Demopoulos*,

> Whether or not the fraud involves a misrepresentation, it must be actual fraud. It does not include constructive fraud. ... And although reliance is a necessary element where the fraud takes the form of a misrepresentation, reliance is irrelevant to broader forms of fraud that do not include a representation by the debtor. ... Because Section 523(a)(2)(A) includes only actual fraud, not constructive fraud, the focus must be on the debtor's subjective state of mind at the time of the alleged fraudulent conduct, whether the intent to defraud was implemented by a misrepresentation or by some other improper means.

*Demopoulos*, 2008 WL 4489153, at *8 (citations omitted).

Again, while the Credit Union does not specifically argue "actual fraud," it refers to Debtors' "pattern of evasion, as alleged in the ... complaint" as "a basis from which the court should infer fraudulent intent." Response, at 7. The complaint, however, merely alleges in this regard Debtors' failure to tender the certificate of title in response to the Credit Union's numerous demands and their failure to comply with the Circuit Court's order to return the Land Rover to the Credit Union. Even considering these allegations under the somewhat broader standard for actual fraud set forth in *McClellan*, they do not plausibly suggest that Debtors, *at the time they signed the Security Agreement*, were embarking upon a scheme to defraud the Credit Union - - particularly in light of the fact, as indicated above, that Debtors subsequently paid over 82% of the $58,274.54 loaned by the Credit Union for the purchase of the Land Rover.

Accordingly, while intent may be alleged generally, there is no allegation in the complaint of a present intention not to perform the promise to perfect the Credit Union's lien, and the facts alleged in the complaint do not plausibly suggest such an intent. Under the circumstances, the Credit Union has failed to state a plausible claim for relief under § 523(a)(2)(A).

**Nondischargeability claim under § 523(a)(2)(B):**

Section 523(a)(2)(B) renders nondischargeable any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by – ... (B) use of a statement in writing – (i) that is materially false; (ii) respecting the debtor's or an insider's financial condition; (iii) on which the creditor ... reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive." The Credit Union contends that Debtors made two actionable written statements, i.e., the promise in the Security Agreement to perfect the Credit Union's lien and the restrictive endorsement on the proceeds check, again promising to perfect the lien. Debtors, however, contend that these statements are not statements "respecting ... financial condition" within the purview of the statute.

Collier notes that "[n]either the phrase 'respecting the debtor's... financial condition' nor the term 'financial condition' is defined" in the Bankruptcy Code and that "[c]ourts are sharply divided on the proper scope of the term." 4 Collier on Bankruptcy ¶ 523.08[2][c] (16th ed. 2010). In *In re Brzakala*, Judge Goldgar opined that in order for a statement to qualify as a statement "respecting financial condition,"

> the statement must do more than just prompt speculation about the debtor's finances. It must be "sufficient to determine financial re-sponsibility." *In re Price*, 123 B.R. 42, 45 (Bankr.N.D.Ill.1991). In the case of an individual, for example, "statements of income and expenses or schedules of assets and liabilities" will qualify. *Id.* Transactional documents that merely imply a certain financial status, on the other hand, will not. *See, e.g., In re Segal*, 195 B.R. 325, 332 (Bankr.E.D.Pa.1996) (finding lease and promissory note insufficient); *City Fed. Sav. Bank v. Seaborne (In re Seaborne)*, 106 B.R. 711, 714 (Bankr.M.D.Fla.1989) (finding loan closing documents insufficient).

*In re Brzakala*, 305 B.R. 705, 709 -710 (Bankr. N.D.Ill. 2004). In *Brzakala*, the creditor sought to state a claim under § 523(a)(2)(B) based on two uncollectible checks given by the debtor and certain promises the debtor made in a settlement agreement. The court rejected the claim, explaining:

> The [Plaintiffs] here appear to allege that the two uncollectible checks and the settlement agreement are statements "respecting the debtor's financial condition." They are not. A bad check is not a statement of any kind, much less a false statement about someone's financial condition. ... As for the settlement agreement, it never mentions [Debtor's] financial condition. It simply contains promises on [Debtor's] part to pay a sum of money and to grant a mortgage in return for the dismissal of a civil action. Inferences that might be drawn about [Debtor's] financial condition from those promises are not enough to bring the settlement agreement under section 523(a)(2)(B).

*Brzakala*, 305 B.R. at 710.

Likewise, in this case, the Security Agreement and proceeds check simply contain promises by Debtor to have the Credit Union's security interest shown on the certificate of title. They shed no light on Debtors' financial condition and do not give rise to any meaningful inferences about it.

The Credit Union nonetheless asserts that this case is similar to *Engler v. Van Steinburg (In re Van Steinburg)*, 744 F.2d 1060 (4th Cir. 1984), where an individual loaned the debtor $5,500 and obtained in exchange a security interest in the debtor's livestock and farm implements. The debtor assured the creditor orally throughout the loan negotiations that he would have a first priority security interest in the debtor's livestock and farm implements, even though the debtor knew that other creditors already had superior liens. *Id.* at 1060. The bankruptcy court held that the debtor's oral misrepresentations that the property was free and

clear constituted statements relating to his financial condition within the purview of §523(a)(2)(B). On appeal, the Fourth Circuit affirmed, espousing the broader view of the scope of that provision and rejecting the contention that statements "respecting financial condition" are limited to formal financial statements. *Id.*

Even if this court were bound by the Fourth Circuit's holding in *Van Steinburg* - - which it is not - - that case is easily and materially distinguishable. There, the debtor was making a representation about the unencumbered status of assets that he already owned, i.e., information that is often material to a lending decision. Here, on the other hand, the Credit Union was financing the purchase of a new asset, on which it would have a first priority purchase money security interest. Debtor, in making the promise to perfect that lien, was in no way providing information concerning the unencumbered status of any assets that he already owned - - or indeed, any information concerning the value or extent of his assets and liabilities.

Finally, the court notes that the Credit Union has not only failed to adequately plead a statement respecting Debtors' financial condition, but it also has failed to adequately plead intent to deceive, as required by § 523(a)(2)(B)(iv). In this regard, the Credit Union has the same problems discussed above concerning its allegation of intent to deceive under § 523(a)(2)(A). Under the circumstances, the Credit Union has failed to state a plausible claim for relief under §523(a)(2)(B).

**Nondischargeability claim under § 523(a)(6):**

Section 523(a)(6) renders nondischargeable any debt "for willful and malicious injury by the debtor to another entity or to the property of another entity." The Credit Union alleges in its

complaint that Debtors, "in obtaining the unperfected title from the dealer and not tendering the certificate to the Credit Union" as required by the terms of the Security Agreement and restrictive endorsement, and by "ignoring the Circuit Court's order ... to surrender the vehicle," Debtors "willfully, maliciously and intentionally harmed the Credit Union by depriving it [of] its rights of recourse to the collateral." Complaint, at ¶¶ 14, 16. In its response brief, the Credit Union urges:

> [T]he Credit Union's adversary does properly allege willful and malicious conduct in order to establish plausible claims under §523(a)(6).
> The Credit Union's complaint cites the Defendant's intentional failure to comply with the Judgment in Detinue wherein Defendants were ordered to turn over the Land Rover. It also alleges the Defendant's intentional and malicious failure to comply with the Credit Union's security agreement by refusing to properly title the Land Rover with the Credit Union's lien. The Defendant's themselves further exacerbate their willfulness and maliciousness to disregard obligations to the Credit Union by listing the Credit Union as "unsecured" in their asset schedules knowing they had purposely refused to comply with the Credit Union's many requests to perfect its security interest, as well as the state court Judgment in Detinue.

Response, at 12.

It should first be noted that the Circuit Court's "Judgment in Detinue" merely finds that the Credit Union had established a right to possession of the Land Rover and ordered Debtors to turn over the vehicle within fourteen days. The Credit Union, however, specifically acknowledges in its response that it "does not allege its injury to be loss of possession of the Land Rover ..." Response, at 12. Accordingly, Debtors' failure to turn over the vehicle does not give rise to the injury claimed by the Credit Union.

In addition, the Credit Union's contention that Debtors "further exacerbate[d] their

-13-

willfulness and maliciousness ... by listing the Credit Union as 'unsecured' in their asset schedules" is somewhat incongruous. The Credit Union contends that its injury is "its current unsecured status" ... . Response, at 12. If the Credit Union's claim is - - as it contends - - unsecured, then listing it in any other fashion could have constituted a false oath.

The act purportedly giving rise to the Credit Union's alleged willful and malicious injury, then, is not the failure to turn over possession of the Land Rover or the listing of the debt as unsecured, but the failure to tender the certificate of title as required by the terms of the Security Agreement and restrictive endorsement. Indeed, the Credit Union specifically states that "it alleges its injury to be its current unsecured status due to the Defendant's purposeful, willful and malicious failure to properly retitle the Land Rover." Response, at 12.

Debtors' "fail[ure] and refus[al] to tender to the Credit Union the certificate of title" constitutes a breach of contractual obligations under the Security Agreement and the restrictive endorsement. In *In re Salvino*, 373 B.R. 578 (Bankr. N.D.Ill. 2007), Judge Wedoff noted that the circuits are split as to the question whether (or to what extent) "willful and malicious injury" within the purview of § 523(a)(6) encompasses intentional breaches of contract:

> The Fifth Circuit holds that any breach of contract is nondischargeable as a willful and malicious injury if the debtor either intended to injure the other party to the contract by breaching it or if injury to the other party was "substantially certain" to result from the breach; tortious conduct is not required. *See In re Williams,* 337 F.3d 504, 510 (5th Cir.2003) ( "[D]ischargeability of contractual debts under Section 523(a)(6) depends upon the knowledge and intent of the debtor at the time of the breach, rather than whether conduct is classified as a tort....").
>
> The Ninth Circuit, on the other hand, holds that "to be excepted from discharge under § 523(a)(6), a breach of contract must be accompanied by some form of 'tortious conduct' that gives rise to 'willful and malicious injury.' " *In re Jercich,* 238 F.3d 1202, 1206 (9th Cir.2001). Unreported decisions from the Sixth and Tenth Circuits are similarly

split. ... The Seventh Circuit has not addressed the question. ...

*Id.* at 588. Judge Wedoff concluded that "the better reading of § 523(a)(6) is the one requiring tortious conduct as an essential element of a 'willful and malicious injury.'" *Id.* at 589. As a result, he held that the debtor's "breach of his employment contract, *standing alone*, fails to generate nondischargeability" under § 523(a)(6). *Id.* at 591 (emphasis added).

Judge Zagel, in an unreported decision, reviewed *de novo* Judge Wedoff's conclusion requiring tortious conduct as an essential element of a willful and malicious injury. He affirmed that conclusion, stating that he agreed with the bankruptcy court's four considerations in support, i.e.:

> (1) the common application of "willful and malicious" strongly suggests its limitation to torts, making nondischargeable only debts arising from the same sort of conduct that the common law discourages by punitive damages; (2) the reenactment of the "willful and malicious injury" standard for nondischargeability from the Bankruptcy Act of 1898 indicates Congress' presumptive intent to continue the established practice of limiting its application to tortious conduct; (3) the common law definition of "willful and malicious" applied by the Fifth Circuit, which encompasses not only actual intent to harm but also intentional acts that the debtor believes are substantially certain to cause harm, was not developed in connection with breach of contract, and when applied in the context of § 523(a)(6) dramatically expands the number of nondischargeable debts and diminishes the scope of bankruptcy discharge; and (4) making intentional breaches of contract nondischargeable under § 523(a)(6) would create substantial tension with § 365(a) of the Bankruptcy Code, which authorizes a debtor to intentionally breach a contract if doing so will maximize the value of the debtor's property.

*Wish Acquisition, LLC v. Salvino*, 2008 WL 182241, *4 (N.D.Ill. 2008).

Judge Zagel further noted that the Supreme Court, in its examination of the language of §523(a)(6) in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), "makes clear that debt arising out of a

-15-

simple breach of contract absent a showing that the purpose of the breach was to cause injury is not a nondischargeable debt within the meaning of § 523(a)(6)." *Salvino*, 2008 WL 182241 at *4.[1] Judge Zagel went on to note that

> [t]he vast majority of contracts are entered into for reasons of pecuniary gain, and the foreseeable consequences of breach are also pecuniary. Thus, a party may intentionally breach a contract with the knowledge that an injury may result, but the nature of the injury is in large part foreseeable, and, more importantly, assumed by both parties as part of the risk, or cost, of doing business.

*Id.*[2]

---

[1] In *Geiger*, the Supreme Court had to determine whether a medical malpractice judgment was nondischargeable, and it framed the "pivotal question" under §523(a)(6) as whether that provision's "compass cover[s] acts, done intentionally, that cause injury (as the [plaintiffs] urge), or only acts done with the actual intent to cause injury (as the Eighth Circuit ruled)." *Geiger*, 523 U.S. at 61. The Court held that debts arising from recklessly or negligently inflicted injuries are outside the scope of §523(a)(6), explaining:

> The word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. ... [A]s the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences* of an act," not simply "the act itself."
>
> The [plaintiffs'] more encompassing interpretation could place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended ... Every traffic accident stemming from an initial intentional act ... could fit the description. .... A "knowing breach of contract" could also qualify. ... A construction so broad would be incompatible with the "well-known" guide that exceptions to discharge "should be confined to those plainly expressed."

*Geiger*, 523 U.S. at 61-62 (citations omitted; emphasis in original).

[2] Noting that the Seventh Circuit had not addressed the question directly, Judge Zagel added that in *In re Hallahan*, 936 F.2d 1496 (7th Cir. 1991), the Court had affirmed a judgment of nondischargeability under §523(a)(6) involving the breach of a covenant not to compete where the debtor had conceded it was a willful breach. *Wish Acquisition v. Salvino*, 2008 WL 182241 at *4 (citing *Hallahan*). However,

> [t]he issue of whether § 523(a)(6) requires tortious conduct was neither presented on appeal nor discussed by the court. ... The weight of *Hallahan* is undermined by the fact that it is a pre-*Geiger* decision. Furthermore, language from *Hallahan* is inconsistent with the holding of at least one subsequent, unpublished Seventh Circuit case that clearly states § 523(a)(6) is intended to prevent the discharge of debts as a result of *intentional torts*. *In re Pickens*, 2000 WL 1071464, *1 (7th Cir. Aug.1, 2000) (emphasis added) (citing *Geiger*, 523 U.S. at 64).

*Wish Acquisition v. Salvino*, 2008 WL 182241 at *4.

In *In re DeMarco*, 240 B.R. 282 (Bankr. N.D.Ill. 1999), Judge Katz observed that "in many instances, an action perpetrated with the intent to procure financial gain will cause a resulting loss to another party." *Id.* at 288. However, "the fact that such a loss occurs, even if such a loss is within the knowledge of the defendant, has been insufficient to satisfy the stringent requirements for pleading and proving a willful and malicious injury under § 523(a)(6)." *Id.* In *DeMarco*, the plaintiff broadcast the encoded, closed-circuit telecast of the professional fight between Evander Holyfield and Mike Tyson, and plaintiff owned exclusive commercial exhibition and distribution rights thereto. Debtor/defendant intercepted, decoded, and exhibited the broadcast at a sports bar that she owned and operated, allegedly in violation of the Cable Communications Policy Act of 1984. *Id.* at 284.

In granting the debtor's motion to dismiss the plaintiff's complaint for a determination of nondischargeability under § 523(a)(6), Judge Katz noted that the plaintiff had merely alleged the debtor's "willful" interception and exhibition of the event. Plaintiff additionally alleged, "in conclusory fashion," that the debtor "willfully and maliciously" injured the plaintiff by exhibiting the event without authorization. *Id.* at 287. These conclusory statements and employment of the terms "willful and malicious" did not suffice to state a claim under § 523(a)(6); the plaintiff had "not pleaded any facts suggesting either that [the debtor] acted with the intent to injure [the plaintiff] or its property, or even that [the debtor] had knowledge that she would cause substantial injury to [the plaintiff] or its property." *Id.* at 288. The debtor broadcast the fight in a commercial establishment, and the court drew the inference that the debtor broadcast it to increase revenue - - not with the intent of harming the plaintiff. *Id.* The court accordingly dismissed the § 523(a)(6) claim, but with leave to amend, as there was "potential for curing the

defects." *Id.* at 290.

Here, the Credit Union has alleged that Debtors' failure to tender the certificate of title as required by the terms of the Security Agreement and restrictive endorsement resulted in injury to the Credit Union, i.e., its unsecured status in this case. While the Credit Union includes conclusory allegations of willfulness and maliciousness in its complaint, it offers nothing to plausibly suggest that the contract breach was in fact "willful and malicious." The additional allegations concerning Debtors' failure to comply with the Circuit Court's turnover order or their listing of the Credit Union's claim in this case as unsecured do not rise to the "something more" - - tortious or otherwise - - that is necessary to plausibly transform this contract breach into a willful and malicious injury under § 523(a)(6). As indicated above, the failure to turn over possession of the vehicle in accordance with the Circuit Court's order does not give rise to the injury that the Credit Union claims in this proceeding. More importantly, it does not reflect upon Debtors' motive in failing to tender the certificate of title or tend to plausibly suggest that such failure stemmed from a willful and malicious intent to harm the Credit Union.

Debtors filed this chapter 11 reorganization case not long after the turnover deadline, and voluntary turnover of the vehicle after the petition could have violated Debtors' obligations under the Bankruptcy Code. Listing the Credit Union's claim as secured, if - - as contended by the Credit Union itself - - it is unsecured, could have constituted a violation as well.

Under the circumstances, the Credit Union has failed to state a plausible claim for relief under §523(a)(6).

## CONCLUSION

For all of the reasons set forth above, Debtors' motion to dismiss will be granted, and the Credit Union's complaint will be dismissed without prejudice. A separate order will be entered.

Dated: September /7 2010                    ENTER:

 

 

Susan Pierson Sonderby
United States Bankruptcy Judge